## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAWRENCE MALAR, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| DELAWARE COUNTY, and | : | |
| WALTER R. OMLOR, JR. | : | No.  08-960 |
| Defendants. | : | |

## M E M O R A N D U M

SITARSKI, M.J.                                                    OCTOBER 23, 2009

    Currently pending before the Court is a Motion for Summary Judgment filed by

Defendants Delaware County, and Walter R. Omlor, Jr. ("Defendants").  For the following

reasons, the Motion will be GRANTED.


I.    FACTUAL BACKGROUND

    Plaintiff, Lawrence Malar, was arrested by the Chester Police Department, in the City of

Chester, Delaware County on June 9, 2005, and charged with possession of a controlled

substance.[1]  *See* Def. Stat. in Supp. of Summ. J., Ex. 1.  Malar retained attorney John J. Whelan

to represent him in connection with his arrest.  After consultation with his attorney, Malar

decided to apply for admittance to Delaware County's Accelerated Rehabilitative Disposition

("ARD") program.  *Id.* at Ex. 2.

---

    [1]  The Court sets out the facts that are not in dispute.  Any factual issue in dispute is
viewed in the light most favorable to Plaintiff.

A.      **Delaware County's ARD Program.**

Delaware County's ARD program is a pre-trial diversionary program available to non-violent, first time offenders.  Application to the ARD program is voluntary; Defendants in criminal matters are under no obligation to participate in the program.  Defendants, Delaware County and Walter R. Omlor, Jr., the Director of Delaware County's Community Corrections Department, administer the program.  Complaint at ¶ 3.  Once the Delaware County District Attorney approves the offender's participation in the ARD program, the Delaware County Court of Common Pleas holds a hearing to approve of this non-trial disposition of the criminal matter.

Defendant Omlor testified that he, as director of the ARD program, appears at all of these ARD hearings and explains to all potential ARD applicants the requirements of Delaware County's ARD program.  Omlor informs the applicants  that community service work primarily consists of manual labor.  Omlor Aff. at ¶¶ 2-3.  Omlor also informs participants that community service work is conducted in various weather conditions and that participants should dress appropriately.  Omlor Aff. at ¶ 3.  Record evidence also establishes there is a written notice hanging in the Community Service office, stating that community service consists of manual labor "IN ALL TYPES OF WEATHER CONDITIONS.  YOU WILL PERFORM VARIED MANUAL LABOR ASSIGNMENTS."  *See* Def.'s Stat. in Supp. of Summ. J., Ex. 6.  (emphasis in original).

Thereafter, ARD participants receive written confirmation of their community service dates, and are advised in that letter that community service typically consists of manual labor, including walking, lifting, and bending.  The notice also reiterates that ARD participants should dress for outside work, unless they are assigned to an alternative work detail.  *See* Def.'s Stat. in

Supp. of Summ. J., Ex. 8.

The uncontested evidence establishes that it is the policy of the Delaware County community service department to assign "light duty" to ARD participants who cannot perform manual labor.  Omlor Aff. at ¶ 5.  Mr. Omlor stated that persons who present valid doctor's notes in advance of their appearance for community service may be given light duty.  *Id.;*  Def.'s Stat. in Supp. of Summ. J., at ¶ 33.  Mr. Omlor further stated that if a community service worker reporting for their work assignment advises that they are physically unable to perform the manual labor required, they are sent home for the day, with directions to report to the community service office in Media.  *See* Def. Stat. in Supp. of Summ. J., at ¶ 34.  Mr. Omlor further attests that "if a Defendant appears at the Emergency Training Center with a doctor's note and advises that he is ill or physically incapable of working that day as scheduled, the policy of the department is that any documentation provided by the Defendant is to be faxed to the Community Service office in Media and the Defendant is told to return home and contact the Media office to make future arrangements to complete the work."  *See* Def.'s Stat. in Supp. of Summ. J., Ex. 6, at ¶ 9.

### B.    Plaintiff's Participation in the ARD Program.

Malar's application for ARD was approved by the Delaware County District Attorney's Office.  A hearing in the Delaware County Court of Common Pleas to seek judicial approval for Malar's admittance to the program was scheduled for February 15, 2006.  Def.'s Stat. in Supp. of Summ. J., Ex. 7.  On that date, however, Malar reported to the wrong courtroom.  Malar Dep. at 16; Malar Aff. at ¶ 5.[2]  By the time Malar arrived at the correct courtroom, the ARD hearings

---

[2]  Defendants have filed a Motion to Strike the "Sham" Affidavit of Mr. Malar submitted in opposition to the defendants' motion for summary judgment.  It does appear that the affidavit submitted by Mr. Malar conflicts with Mr. Malar's deposition testimony in some respects, but the

scheduled for that day had concluded, and Malar was the only ARD applicant present in the court room.  Malar Dep. at 16; Malar Aff. at ¶ 7.  There is some dispute as to whether Malar spoke with Attorney Whelan or an associate of Whelan's named Sandra M. Liberatori prior to his ARD hearing, but it is undisputed that Malar was represented by an attorney at his hearing.  Malar Dep. at 17; Malar Aff. at ¶ 7.  Malar testified that the hearing took approximately five minutes. Afterwards, attorney Whelan informed him that his application for ARD had been approved. Malar Aff. at ¶ 7.  Thereafter, Malar was ordered to complete 16 hours of community service. Def.'s Stat. in Supp. of Summ. J., Ex. 7.

Malar has presented no evidence or testimony indicating that he informed the court that he had any medical conditions or physical limitations that would impact the type of community service work he could perform.  Malar asserts that he discussed his physical limitations as related to his community service work with his attorney at some point on the morning of his ARD hearing.  Malar Aff. at ¶¶ 7-8.  There is no evidence that any such issue was brought up with the court, either by Malar or by his attorney, at the time of the ARD hearing.  Indeed, it is significant to note that as a result of Malar going to the wrong courtroom on the day of his ARD hearing, he missed the ARD orientation speech given by Defendant Omlor, outlined above, at which ARD participants are informed that community service consists of manual labor, often performed outside, even in adverse weather conditions.  Malar Dep. at 16; Malar Aff. at  ¶7; Omlor Aff. at ¶¶ 2-3.

Thereafter, having been approved for ARD, Malar went to the Delaware County

---

facts that are material to this summary judgment ruling have not been contradicted or modified by Mr. Malar (or by anyone else).

Community Service Office, where he selected the dates on which he would perform his community service. Malar selected Monday, February 27, and Tuesday, February 28, 2006, as the dates to serve his community service. Malar Dep. at 18; Malar Aff. at ¶ 7; Def.'s Stat. in Supp. of Summ. J., Ex. 8.

At some point prior to the commencement of his community service work, Malar obtained two notes from two of his treating physicians. Malar Dep. at 22-25; Malar Aff. at ¶ 8. One note, dated February 17, 2006, from Malar's orthopedic specialist, Stuart Gordon, M.D., stated that Malar should be "restricted from doing any physical activity due to bilateral knee degenerative joint disease [and] degenerative medial meniscal tears [and] lumbar arthritis." Def.'s Stat. in Supp. of Summ. J.,  Ex. 10. A second note from Malar's pulmonologist, Gerald Meis, D.O., stated that Malar suffers from "severe COPD [chronic obstructive pulmonary disease] as well as exertional dyspnea and chest tightness." *Id.*, Ex. 9. Dr. Meis further stated that Malar's "community service needs to be limited to non-strenuous activities" and that Malar's "ability to walk distances as well as physical lifting is minimal." *Id.*

Malar reported for his community service on the morning of February 27, 2006**.** Malar Dep. at 26. Upon arrival at the Delaware County Emergency Training Center, Malar presented his two doctors' notes to an unidentified man behind the desk at the Training Center. Malar Dep. at 26-27; Malar Aff. at ¶ 9. According to Malar, the desk clerk looked at the notes and informed Malar that he would fax the notes. *Id.* The desk clerk did not tell Malar where, or for what purpose, he intended to fax the notes, and Malar made no further inquiry regarding the doctors' notes. *Id.* At no point during his two days of community service did Malar make any further mention of the doctors' notes, or of his medical conditions.

5

Malar contends that this same desk clerk informed him that he would be working with community service supervisor Tish Ochaby.  Malar Dep. at 28, Omlor Dep. at 19-20.  Malar and the other community service workers were transported by van to Glenolden Park.  Malar Dep. at 28.  At Glenolden Park, Malar was given a broom, and was directed to sweep the streets within the park.  Malar Dep. at 28-29.  Malar also assisted in picking up the refuse that had been collected by the community service workers.  Malar Dep. at 29.  Malar stated that while performing these tasks, he experienced difficulty breathing and shortness of breath.  Malar Dep. at 30-31.  Malar informed Ochaby, his community service supervisor, that he was having some problems with his breathing.  Malar Dep. 31-32.  In response to this complaint, Ochaby told Malar to sit in the community service van and catch his breath.  *Id*.  Malar was not able to say how long he sat in the van, or how many times he returned to the van throughout the day.  *Id.* Malar completed the workday at Glenolden Park and returned to the training center in the van with the rest of the community service workers.  *Id.*  Malar then drove himself home at the end of the workday.

The next morning, February 28, 2006, Malar again reported to the Delaware County Emergency Training Center for his second and final day of community service.  Malar Dep. at 33.  On this morning, Malar was told that he was assigned to the community service crew supervised by Vince Vitullo.  Malar Dep. at 33-35; Omlor Dep. at 13-15.  Malar testified that he did not recall who informed him that he would be working with Vitullo, but he testified that he was sure that it was not the desk clerk to whom he had given his doctors' notes the previous day. *Id.*  Malar admitted that he did not ask this man about the doctors' notes he had previously submitted, nor did he raise the subject with Vitullo.  Malar Dep. at 35.  Malar testified that he

6

did not inquire about the doctors' notes on the second morning because he "didn't feel it was necessary" since the man he had originally given the notes to "didn't care." *Id.*

Malar was then transported to the Yeadon Police Administration Building, where he was instructed to remove books from an office. Malar Dep. at 36. When that task was completed, Malar was instructed to remove files and other items from a closet and to sweep out the closet. *Id.* When work had been completed at the Yeadon Police Administration Building, the community service workers were transported to the Yeadon Swim Club. Malar Dep. at 37. At the Swim Club, Malar was instructed to pick up trash on a hill located between the Swim Club and a nearby shopping center. *Id.* Upon completion of this task, the community service workers were driven back toward the training center. When the van arrived at Calcon Hook Rd., the location of the training center, the workers were instructed to exit the van and walk back toward the training center, picking up trash along the way. Malar Dep. 39-40. The van, driven by Supervisor Vitullo, drove slowly behind the workers as they made their way toward the training center. *Id.* Malar stated that after he had walked about 100 feet, he became unable to breathe and doubled over in severe pain. Malar Dep. at 40. Malar testified that Vitullo pulled the van up next to him and told him to get in. Malar Dep. at 41. Vitullo did not say anything to him when he got into the van, and Malar did not say anything to Vitullo. *Id.* Malar entered the van between 3:30 and 3:45, and did no more work before the community service workday ended at 4:00. *Id.* At the end of the day, Malar drove himself home. *Id.*

Malar testified that when he returned home that evening, he had trouble breathing and felt pain in his lungs. Malar Dep. at 42. He went to bed thinking that rest might make him feel better, but he was unable to sleep. *Id.* At approximately 1:00 a.m. on March 1, 2006, Malar

drove himself to the emergency room at Taylor Hospital, complaining of shortness of breath and pain in his back.  Malar Dep. 33-34.  Malar's medical records indicate that he was admitted to the hospital on March 1, 2006, due to shortness of breath, COPD exacerbation, and left lower lobe pneumonia.  *See* Malar History and Physical, attached as Def.'s Ex. 11.  Malar remained at Taylor Hospital until March 6, 2006, when he was discharged in stable condition with instructions to follow up with his pulmonologist, Dr. Meis, and his primary care physician, Dr. John Fanning.  *See* Summary of Discharge, attached as Def.'s Ex. 11.

Malar claims that since his release from the hospital on March 6, 2006, he has continued to experience problems with his breathing, and has been prescribed an oxygen concentrator.  Comp. at ¶ 18.  Malar also states that subsequent to his March 2006 hospitalization, he has been diagnosed with type II diabetes.  *Id.*

## II.    PROCEDURAL HISTORY

Plaintiff Lawrence Malar instituted this civil action on February 25, 2008.  Plaintiff has sued the County of Delaware and Walter R. Omlor, Jr., director of Delaware County's Community Service program.[3]  In his Complaint, he raises several constitutional claims under 42

---

[3]  Plaintiff does not state whether he brings this claim against defendant Omlor in his individual capacity or in his official capacity.  However, the record is devoid of any evidence that would sustain a claim against Omlor in his individual capacity, since there is no evidence that Omlor ever had any direct dealings with plaintiff Malar, or that Omlor even had any awareness of Malar, of his participation in ARD, or of his health issues.  A defendant in a civil rights suit cannot be held liable unless he has personal involvement in the alleged wrongs.  *See Eppers v. Dragovich*, 1996 WL 420830 at *4 (E.D. Pa., July 24, 1996); *see also*, *Agresta v. City of Philadelphia*, 801 F. Supp. 1464, 1468 (E.D. Pa, 1992) (liability of an individual officer must be based on his own acts or omissions); *Reaves v. Vaugh*, 2001 WL 936392 at *4 (E.D. Pa., Aug. 10, 2001) (vicarious liability does not apply to § 1983 claims).  Nor can persons in a supervisory position be held vicariously liable for the acts of the employees of their department.  *See Parratt*

U.S.C. § 1983. Count I alleges that Defendants Delaware County and Omlor, acting under color

of state law, deprived Malar of his constitutional rights under the Fourteenth Amendment,

including his liberty interests in: (1) bodily safety while performing community service; and (2)

an expectation of minimal standards for the safety, health, well being and security of community

service workers.  Complaint at ¶ 28(a)(1)-(2).  In Count II of the Complaint, Malar asserts that

Defendants violated his constitutional rights under the Fourth, Fifth, Eighth, and Fourteenth

Amendments.  Complaint at ¶ 30.  In support of this claim, Malar advances fourteen separate

allegations of the policy or custom of Delaware County that resulted in a violation of these rights.

---

*v. Taylor*, 451 U.S. 527, 537 n.1 (1981).  The mere fact that a defendant is in a supervisory position is insufficient to establish liability under § 1983, as there is no *respondeat superior* liability under § 1983.  A supervisor potentially may be held liable for his subordinate's unlawful activities only upon a showing that the supervisor directed, encouraged, tolerated or acquiesced in the conduct.  *See Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d. Cir. 2001); *Blanche Road Corp. v. Bensalem Twp.*, 57 F.3d 253, 263 (3d Cir. 1995); *Baker v. Monroe Twp.*, 40 F.3d 1186, 1190-91 (3d Cir. 1995).

Given the complete absence of any evidence that would sustain an individual liability claim against Omlor, I will consider this claim as being asserted against Omlor in his official capacity.

In this regard, I further note that a claim against a government employee in their official capacity is a claim against the governmental entity.  In *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985), the Supreme Court held that a suit brought against a public official in his official capacity is equivalent to a suit brought against the public entity.  The Court explained that official capacity suits "represent only another way of pleading an action against an entity of which an officer is an agent." *Id.*  Such suits, "in all respects other than name, [are] to be treated as a suit against the entity. It is *not* suit against the official personally, for the real party in interest is the entity." *Id.*  Thus, all claims against Omlor are to be treated as claims against Delaware County.  *See Stana v. School District of Pittsburgh*, 775 F.2d 122, 130 (3d Cir. 1985) (actions of an official acting in his official capacity are to be equated with the actions of the City itself).

Because all of the claims asserted by Malar are claims asserted against Delaware County, they are evaluated by the standards articulated by the United States Supreme Court in *Monell v. Dep't of Social Services of City of New York,* 436 U.S. 658 (1978).

*Id.* ¶ 30(a)-(o).

On March 19, 2008, Defendants filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6).  In a Memorandum and Order dated August 4, 2008, Judge J. Curtis Joyner denied the Motion to Dismiss on the ground that, although Malar's allegations appeared very close to the line between a § 1983 constitutional violation and ordinary negligence, Malar had met his relatively light burden of pleading and had adequately stated a claim upon which relief might be granted.  *Malar v. Delaware County, et al.*, No. 08-960 (Doc. No. 6) (E.D.Pa. Aug. 4, 2008, Joyner, J.)  On August 14, 2008, Defendants filed an answer.

On November 13, 2008, this matter was reassigned from the docket of Judge Joyner to the docket of Judge C. Darnell Jones, II..  (Doc. No. 11).  Thereafter, on January 20, 2009, Defendants filed the instant Motion for Summary Judgment.  (Doc. No. 16).  Plaintiff responded on February 20, 2009, and Judge Jones held oral argument on Defendants' summary judgment motion on April 27, 2009.  (Doc. No. 23).  On May 14, 2009, the parties consented to the exercise of jurisdiction by a United States Magistrate Judge under 28 U.S.C. 636(c) and Fed.R.Civ.P. 73.  (Doc. No. 34).  This matter was referred to me by Judge Jones.  (Doc. No. 34).

Having considered all of the parties' briefing, together with the attached exhibits, and having reviewed the transcripts of the oral argument before Judge Jones, I now turn to a discussion of the disputed issues.

III.   STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" if there is sufficient evidence from which a jury could find in favor of the non-moving party. *Id.* at 248-29. It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) *(citing U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255.

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Once the moving party carries this initial burden, the non-moving party must "come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions. *Trap Rock Indus. v. Local* 825, 982 F.2d 884, 890 (3d Cir. 1992); *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Instead, the non-moving party must present specific facts and "affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50.

If the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. *Celotex Corp.*, 477 U.S. at 322-23.

## IV.    DISCUSSION

In cases such as this one, where a § 1983 claim is asserted against a governmental entity, the Court's analysis is dictated by the United States Supreme Court's holding in *Monell v. Dep't. of Social Services of City of New York*, 436 U.S. 658 (1978). The *Monell* Court instructed that in order for a plaintiff to prevail in a § 1983 claim asserted against a municipality, a plaintiff must establish that a constitutionally-protected right has been violated, and that such violation is attributable to a "custom, policy, or practice" of the governmental entity.   I will first consider the question of whether Malar's constitutionally-protected rights have been violated.

"Section 1983 establishes a federal remedy against a person who, acting under color of state law deprives another of a constitutional right."[4] *McCurdy v. Dodd*, 352 F.3d 820, 825 (3d Cir. 2003) (quoting *City of Newport v. Fact Concerts, Inc*, 453 U.S. 247, 258 (1981). To state a claim under § 1983, a plaintiff must allege the deprivation of a constitutional right, and that this deprivation was caused by a person acting under color of state law. *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). Section 1983 does not, in and of itself, create any substantive rights,

---

[4]  Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983 (2003).

but instead provides a remedy for a "deprivation of rights established elsewhere in the Constitution or federal laws." *Id.* at 1204.

Thus, the linchpin of any § 1983 claim is the deprivation of a **constitutionally-protected** right.  In the present case, Malar contends that his rights protected by the Fourteenth Amendment's Due Process clause were violated.  The Due Process clause of the Fourteenth Amendment provides that a state may not "deprive any person of life, liberty or property without due process of law." *U.S. Const. Amend. XIV § 1.*  Stated another way, the Due Process Clause of the Fourteenth Amendment protects individuals in their bodily integrity against interference from the state.

The Supreme Court has explained that "[t]he [Due Process] Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.  It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.  Nor does history support such an expansive reading of the constitutional text.*"  DeShaney v. Winnebago County Dept. of Soc. Serv.*, 489 U.S. 189, 195 (1989); *see also Bright v. Westmoreland County*, 443 F.3d 276 (3d Cir. 2006).  As a general matter, "the Due Process Clause does not impose an affirmative duty upon the state to protect citizens from the acts of private individuals." *Sanford v. Stiles*, 456 F.3d 298, 303-04 (3d Cir. 2006).

Malar here invokes the "state-created danger" exception to the general rule that the state does not owe its citizens a duty to protect them from harm. *Deshaney, supra; Kneipp*, 95 F.3d 1199.  This constitutional tort theory has its genesis in the following passage from *DeShaney*:

"While the state may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *DeShaney*, 489 U.S. at 201.

The Third Circuit has identified and defined the parameters of a state-created danger claim on several occasions.  To prevail on a state created danger claim, a plaintiff must establish that:

> (1)  the harm ultimately caused was foreseeable and fairly direct;

> (2)  a state actor acted with a degree of culpability that shocks the conscience;

> (3)  a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general;

> (4)  a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Mark v. Borough of Hatboro,* 51 F.3d 1137,1152 (3d Cir. 1995)*;  Bright,* 443 F.3d at 281; *Kneipp,* 95 F.3d at 1208; *Sanford,* 456 F.3d at 304-305.  A plaintiff's failure to satisfy any one of the four elements defeats his state-created danger claim.  *Sanford*, 456 F.3d at 311 (because plaintiff failed to satisfy one element of state created danger, the claim can go no further); *Phillips v. County of Allegheny*, 515 F.3d 224, 235 (a failure to establish one element "obviates the need to analyze the other three elements. . ." ); see also *Smith v. School Dist. of Philadelphia*, 2009 WL 667455, at *3 (E.D.Pa. Mar.10, 2009) (citing *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 914 (3d Cir.1997).

In analyzing Fourteenth Amendment claims such as this one, we are mindful of the

Supreme Court's admonition in *DeShaney:*

> "[t]he claim here is based on the Due Process Clause of the Fourteenth Amendment, which, as we have said many times, does not transform every tort committed by a state actor into a constitutional violation.  *See Daniels v. Williams*, 474 U.S. at 335-336; *Parratt v. Taylor*, 451 U.S. at 544; *Martinez v. California*, 444 U.S. 277, 285 (1980); *Baker v. McCollan*, 443 U.S. 137, 146 (1979); *Paul v. Davis*, 424 U.S. 693, 701 (1976). A State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes.  But not 'all common-law duties owed by government actors were . . . constitutionalized by the Fourteenth Amendment.'  *Daniels v. Williams, supra*, at 335."

*DeShaney,* 489 U.S. at 202.

### A.  Plaintiff's State-Created Danger Claim (Count I)

Malar alleges that Defendants are liable for violating his substantive due process rights under a state-created danger theory.  Defendants do not contest the fact that Malar can establish the third factor of the state created danger test, that a relationship existed between Malar and Defendants such that Malar was a foreseeable victim of Defendants' acts.  *See* Def's Mot. for Summ. J. at 16-17.   And, for purposes of the present motion only, defendants do not contest Malar's claim that his injuries were foreseeable and fairly direct.  *See Def.'s* Mot. for Summ. J. at 16.  For present purposes, then, I assume that the first and third prongs of the test are satisfied.

Defendants assert that Malar is unable to satisfy the second and fourth elements of the state-created danger test.  Defendants contend that the County's actions were not conscious-shocking, and further contend that the a state actor did not undertake an "affirmative act" which created the opportunity for harm.

I will address each of these elements.

### 1.  Actions that Shock the Conscience

The second element of the state-created danger test requires a plaintiff to show that "a

15

state actor acted with a degree of culpability that shocks the conscience." *Bright*, 443 F.3d at

281; *Schieber*, 320 F.3d at 417 *(quoting Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d

Cir. 1999) ("To generate liability, executive action must be so ill-conceived or malicious that it

'shocks the conscience. ").  There is no "calibrated yardstick" by which conscience shocking

behavior can be measured; "[d]eliberate indifference that shocks in one environment may not be

so patently egregious in another." *Kaucher v. County of Bucks*, 455 F.3d 418, 425 (3d Cir. 2006)

*(quoting County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998)).  Thus, "[t]he exact degree

of wrongfulness necessary to reach the conscience-shocking level depends upon the

circumstances of a particular case." *Nicini v. Morra*, 212 F.3d 798, 810 (3d Cir. 2000); *Miller*,

174 F.3d at 375.  "Only the most egregious official conduct can be said to be arbitrary in the

constitutional sense." *County of Sacramento*, 523 U.S at 846 (citation and internal quotation

omitted).  As the Supreme Court has explained:

> the 'shocks the conscience' standard is a stringent one because
> executive action challenges raise a particular need to preserve the
> constitutional proportions of constitutional claims, lest the
> Constitution be demoted to what we have called a font of tort law.
> Thus, in a due process challenge to executive action, the threshold
> question is whether the behavior of the governmental officer is *so
> egregious, so outrageous*, that it may fairly be said to shock the
> contemporary conscience.

*County of Sacramento*, 523 U.S. at 847 (emphasis supplied).  "Critically, under this standard,

officials will not be held liable for actions that are merely negligent."  *Miller*, 174 F.3d at 374-

375 (citing *County of Sacramento*, *supra*).

Because the "exact degree of wrongfulness necessary to reach the 'conscience-shocking'

level depends upon the circumstances of a particular case," a court must evaluate the conditions

under which a defendant acted in order to determine the relevant standard of culpability. *Miller*, 174 F.3d at 375. Where a defendant is "confronted with a hyperpressurized environment . . . it is usually necessary to show that the [defendant] deliberately harmed the victim." *Estate of Smith v. Marasco*, 430 F.3d 140, 153 (3d Cir. 2005). However, where a defendant has "the luxury of proceeding in a deliberate fashion . . . deliberate indifference may be sufficient to shock the conscience." *Id; see also Sanford,* 456 F.3d at 309 ("in a 'hyperpressurized environment,' an intent to cause harm is usually required. On the other hand, in cases where deliberation is possible and officials have the time to make 'unhurried judgments,' deliberate indifference is sufficient"); *Patrick v. Great Valley School Dist.*, 296 Fed. Appx. 258 (3d Cir., Oct. 9, 2009).

Importantly, the Third Circuit has stated that "mere negligence is not enough to shock the conscience." *Sanford*, 456 F.3d at 311;  *see also Yatsko v. Berewick*, 2008 WL 2444503, at *4 (M.D.Pa. June 13, 2008) ("officials will not be held liable for actions that are merely negligent.") (*quoting Fagan v. City of Vineland*, 22 F.3d 1296, 1303 (3d Cir.1994)); *Rivas v. City of Passaic*, 365 F.3d 181, 196 (3d Cir. 2004) (where emergency medical responders called to the scene of a medical emergency had to act "with some urgency," the second prong of the state-created danger test can be satisfied only by evidence that the EMT's conduct "shocks the conscience by consciously disregarding a substantial risk that Mr. Rivas would be seriously harmed by their actions"); *Ye v. United States*, 484 F.3d 634, 638 n.2 (3d Cir. 2007) (in the context of a doctor treating a patient in a clinical setting, "the required culpability must be somewhere within the bounds of gross negligence, at a minimum, and gross recklessness, at a maximum").

In the instant matter, the course of events that led Malar to perform his community service work on February 27 and 28, 2006, did not occur in a hyper-pressurized environment.

Even if I accept as true defendants' assertion that the employees at the training center were busy "checking people in," this does not amount to a hyper-pressurized environment. Therefore, culpability will be assessed under the deliberate indifference standard.

Malar argues that the "deliberate indifference" prong of the state-created danger test is satisfied because community service supervisor Vince Vitullo ignored the restrictions on his physical activity as described in his doctors' notes.[5] Malar argues that "work supervisor (Vince Vitullo) demonstrated a **deliberate** **indifference** to the medical and physical conditions of Mr. Malar by totally ignoring the information in the medical reports provided by Mr. Malar's physicians." *See* Mem. of Law in Supp. of Pl.'s Ans. to Mot. for Summ. J. at 6 (emphasis in original). I conclude that this argument is unsupported by record facts, and is legally without merit.

There is no evidence that Vitullo had any subjective awareness of Malar's medical reports, or of any limitations on Malar's ability to perform physical labor. Malar acknowledges that Vitullo played no role in checking Malar in when he appeared at Defendants' Emergency Training Center on his first scheduled day of community service. Vitullo first encountered Malar on the second day, when Malar was assigned to his community service work crew. More to the point, there is no evidence that Vitullo ever saw Malar's doctors notes, nor is there any evidence

---

[5] Malar also argues that this prong is satisfied because defendant Omlor failed to establish policies and procedures for screening ARD participants for work assignments based upon their medical and physical limitations, and failed to assess the impact of harsh environmental conditions on the health and safety of ARD participants. This argument misses the mark, because any failure of "policies and procedures" figures into this case only because it is a prerequisite to bringing a constitutional claim against a governmental entity. It is not an independent cause of action. As discussed *supra*, in the absence of a constitutional injury, the question of whether County policies "caused" the injury is not reached.

that Vitullo was ever made aware of Malar's physical limitations.  Malar specifically testified that he did not discuss his medical issues with Vitullo when he first came into contact with him on his second day of service, nor did Malar inform Vitullo that he had submitted doctors notes outlining his physical limitations.  Malar Dep. at 34-35.

Deliberate indifference is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Commissioners of Bryan County, OK v. Brown*, 520 U.S. 397, 410 (1997).  Consequently, Vitullo cannot have demonstrated deliberate indifference toward Malar's medical and physical condition, because the record contains no evidence that Vitullo was even aware of Malar's medical and physical conditions.

In sum, the only act of "conscious-shocking" behavior on the part of a state actor cited by Malar in opposing defendants' motion for summary judgment are the actions (or inactions) of Vince Vitullo in failing to respond to the limitations Malar faced because of his health problems. The record belies any contention that Vitullo was aware of these limitations, much less that his response to the situation rose to the level of deliberate indifference.  Accordingly, Malar fails to satisfy the second prong of the state-created danger test.

## 2.    Affirmative Act

The state created danger doctrine also requires proof that a person acting under color of state law affirmatively use their authority to create an opportunity for harm that otherwise would not have existed.  *Phillips*, 515 F.3d at 325 (citing *Kneipp,* 95 F.3d at 1208).  This prong is "predicated upon the state's affirmative acts which work to the plaintiff's detriment in terms of exposure to danger.  It is the misuse of state authority, rather than a failure to use it that can

violate the due process clause." *Id.*; *Bright*, 443 F.3d at 282 (quoting *D.R. by L.R. v. Middle Bucks Area Vo. Tech*, 972 F.2d 1364, 1374 (3d Cir. 1992).

The Third Circuit has consistently held that, to satisfy the fourth element of the state created danger test, a plaintiff must "allege an affirmative action rather than inaction or omission." *Bright*, 443 F.3d at 282.   In *Bright*, the Third Circuit relied on *DeShaney* in rejecting plaintiff's claim that a police officer's knowledge of a danger to the victim creates an affirmative duty to protect the victim from that harm, noting that "no affirmative duty to protect arises from the State's knowledge of the individual's predicament." *Bright*, 443 F.3d at 284 (internal citation and quotation marks omitted). "Liability requires affirmative state action; mere 'failure to protect an individual against private violence' does not violate the Due Process Clause." *Id.* (quoting *DeShaney*, 489 U.S. at 197).

In *Ye v. United States*, *supra,* the Third Circuit rejected the contention that a medical doctor's assurances that a patient would be fine constituted an "affirmative act" within the meaning of the state-created danger test.   There, the doctor failed to recognize his patient's symptoms of severe cardiac distress, and sent him home with instructions to take cough medicine and he would be fine.   Quoting *DeShaney*, the *Ye* court stated that the "'affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act.'"   484 U.S. at 638 (quoting *DeShaney,* 489 U.S. at 200).   *See also Kaucher v. County of Bucks*, *supra* (petitioners must allege affirmative acts that were the "but for cause" of the risks they faced; failures to act cannot form the basis of a valid § 1983 claim) (citing *Bright*, 443 F.3d at 283-84; *Morse*, 132 F.3d at 907-08 (failure to prevent mentally disturbed individual from

entering school and attacking teacher); *D.R. by L.R.*, 972 F.2d at 1376 (failure of school officials

to investigate and stop instances of sexual abuse of students) (*en banc*); *Brown v. Grabowski*,

922 F.2d 1097 (3d Cir.1990) (failure to file criminal charges against an individual who

repeatedly threatened and assaulted former girlfriend, despite reports to the police by the victim

and her family)).

 Malar asserts that the affirmative act of Defendants is "the deliberate indifference to [his]

medical and physical limitations by assigning him to further strenuous physical activity under

harsh environmental conditions." Pl.'s Ans. to Mot. for Summ. J. at 8. Defendants emphasize

that they did not affirmatively act to assign Malar to community service work; rather, that it was

Malar himself that chose to participate in the ARD program. Defendants argue that Malar "made

a reasoned decision" to perform his community service and that there is "no evidence that

[Defendants] arbitrarily forced him to work." Def.'s Mot. for Summ. J. at 26-27. Consequently,

Defendants argue that their conduct in relation to Malar constitutes "inaction" or a "failure to

act" and that "a failure to act can never amount to an affirmative act." *Id.* (citing *Bright*, 443

F.3d at 282).

 There is no evidence that Defendants affirmatively used their authority to create an

opportunity for harm that otherwise would not have existed. Defendants did not force Malar to

perform community service. Malar voluntarily sought participation in the ARD program after

consultation with his attorney. Def.'s Mot. for Summ. J. at 26-27. Defendants did not choose

the dates of February 27 and 28, 2006. Malar himself selected those dates. Malar testified that

he reported for, and performed, his community service work on February 27 and 28, 2006,

because he felt he was dressed warmly enough and because he thought he could do the work.

21

Malar Dep. at 20, 28.  Indeed, Malar himself, after participating in the community service work for one day, returned for a second day of service.

To the extent that Malar asserts that a state actor committed the requisite affirmative acts by disregarding his doctors' notes, or by failing to independently recognize that Malar's physical condition should have prevented him from participating, any such conduct constitutes inaction, not an affirmative act.  The Third Circuit has repeatedly foreclosed state-created danger claims premised on inaction, emphasizing that a state-created danger claim must be premised on affirmative acts by a state actor that created an opportunity for harm that did not otherwise exist. The record will not support such a finding in the present case.

### 3.       Conclusion as to State-Created Danger

As has been noted frequently, state-created danger claims are too often premised on factual scenarios ranging from unfortunate and avoidable, to truly heartbreaking.  As has just as often been noted, "we cannot allow our sympathies to prevent us from following the law." *Kepner v. Houstoun*, 164 F. Supp.2d 494, 501 (E.D. Pa., 2001); *Dubrow v. City of Philadelphia*, 2008 WL 4055844 (E.D. Pa., Aug. 28, 2008) (*quoting Kepner).*

Accordingly, this constitutional tort claim must fail, because Malar cannot meet two parts of the four-part test that our Court of Appeals has delineated and applied on many occasions.

### B.       Municipal Liability (Count II)

Because I have concluded that there was no constitutional violation in this case, Malar's *Monell* claim against the governmental agency also fails as a matter of law.  *See Monell*, *supra,* 436 U.S. at 691-692 (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 121 (1992) ("for there to be municipal liability, there still must be a violation of plaintiff's constitutional rights")).

22

Thus, plaintiff's claim against Omlor in his official capacity also fails as a matter of law.  *See* footnote 3, *supra.*

## V.       CONCLUSION

Accordingly, summary judgment in favor of defendants is appropriate in this case.  An appropriate order follows.

BY THE COURT:


 /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE

23